**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-cr-623 (CRC)** |
| **MICHAEL ECKERMAN,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.   For the reasons set forth herein, and consistent with its promise in the plea agreement to recommend a sentence of incarceration at the bottom of the applicable Sentencing Guidelines range, the government requests that this Court sentence defendant Michael Eckerman to 24 months of incarceration, along with three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

### I.    INTRODUCTION

On January 6, 2021, the defendant Michael Eckerman, wearing a tactical vest and neon gloves, participated in three separate breaches of police lines during the twenty minutes he spent inside the United States Capitol building while it was under siege.   Eckerman forcibly facilitated one of those breaches himself—an incident forming the basis of Eckerman's count of conviction, a violation of 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers), to which Eckerman pleaded guilty via plea agreement.   Specifically, Eckerman maneuvered himself to the front of standoff between the mob and a small group of U.S. Capitol Police ("USCP") officers who were guarding a stairway between the Memorial Doors and the Crypt.   Shortly after rioters warned

1

the officers that they were about to breach the line, Eckerman pushed USCP officer K.Y. and knocked him off balance, causing him to fall and resulting in a gap in the police line.  Rioters, including Eckerman and his two companions, then surged through that gap and climbed the now-accessible stairs, allowing the mob to penetrate the second floor of the Capitol and further complicate police efforts to protect the building and its occupants.

Because of the actions of Eckerman and other rioters like him, the January 6 attack forced the interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of presidential power, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

The government recommends that this Court sentence Eckerman to 24 months' incarceration, which represents the low end of the applicable (and undisputed) Sentencing Guidelines' range of 24 months.[2]   A 24-month sentence is appropriate in this case because Eckerman: (1) encouraged rioters attacking police officers outside the Capitol on the West Plaza and was close enough to the fray to suffer the effects of a chemical irritant that had been deployed, and yet he proceeded to storm the Capitol building; (2) was part of mob surges that forcibly breached three separate police lines inside the Capitol, including just outside the House Chamber at a time when members of Congress were still sheltering inside; (3) during one such breach, pushed USCP officer K.Y., causing him to fall and rendering him vulnerable to another rioter who subsequently sprayed him in the face with a fire extinguisher; and (4) entered a sensitive area of

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.  That amount reflects, in part, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[2] Eckerman's plea agreement includes an agreement by the government to cap its allocution at the low end of the Guidelines—here, 24 months' imprisonment.

the Capitol—the Rayburn Conference Room—where he took photographs as souvenirs.

A 24-month sentence adequately reflects the gravity of Eckerman's aggressive and escalating conduct and serves to deter those who would seek to emulate it.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers to the court to the stipulated Statement of Offense ("SOO") filed in this case, ECF No. 58, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the 2020 presidential election.

### B.    Michael Eckerman's Role in the January 6, 2021 Attack on the Capitol

#### *Planning for January 6, 2021*

In the days and weeks leading up to January 6, 2021, Eckerman attempted to recruit friends and family members to join him at the "Stop the Steal" rally in Washington, D.C., emphasizing that something "epic" and "historic" was going to happen.   On December 29, 2020, for example, he wrote his cousin (Person-1) that he was "pumped up," and that the rally on January 6 would possibly be like "middle earth."[3]   To another friend he invited to go to D.C., Eckerman wrote, "1984 is the new 1776 bro shit is going down and I'll be there."   He added, "even if it's the end of the republic I'll be there."   On January 5, 2021, a friend texted Eckerman, "[s]o you started any riots yet," to which he responded, "I won't do that with [Person-1] but [if] I had some back up I

---

[3] This statement appears to refer to the scene of several battles in J.R.R. Tolkien's Lord of the Rings book series.   *See* Emily Martin, *The Lord of the Rings: The Essential Guide to the Peoples, Places, and History of Tolkien's Middle-earth* (July 19, 2022), *available at*
 https://www.audible.com/blog/article-the-lord-of-the-rings-middle-earth-explained.

would be in it."

***Eckerman's Conduct Outside the Capitol Building on January 6, 2021***

On January 5, 2021, Eckerman traveled from his home in Wichita, Kansas, to Washington, D.C., along with Person-1 to attend the "Stop the Steal" rally.   At their hotel, Eckerman and Person-1 met a group of like-minded individuals from New Hampshire that included his eventual co-defendant, Kirstyn Niemela, and Niemela's travel companions, Stefanie Chiguer and Mark Leach.[4]   Eckerman and his cousin attended the "Stop the Steal" rally along with the New Hampshire group and another new friend from the hotel, Person-2, from Missouri.   *See* Image 1 below.



**Image 1**: *Eckerman (male wearing red baseball cap and tactical vest), Niemela (sunglasses), Chiguer (flag cape), Person-1 (hand shielding eyes), and Person-2 (gray jacket, red "Trump" beanie) at "Stop the Steal" rally*

---

[4] As this Court knows, Niemela went to trial in this matter on January 23, 2023, and was convicted on all counts against her.   Mark Leach testified as a defense witness in Niemela's trial, the transcripts of which are forthcoming.   *See United States v. Niemela*, 21-cr-623-2 (CRC). Chiguer has since pleaded guilty to Parading, Demonstrating or Picketing in a Capitol Building before Judge Mehta in case number 22-cr-25.   Her sentencing has been set for June 9, 2023.

After listening to the former President's speech, the group marched to the Capitol. At approximately 2:01 p.m., Eckerman, Chiguer, and Person-2 observed rioters assaulting Metropolitan Police Department (MPD) officers on the West Plaza of the Capitol, near the scaffolding set up for the upcoming presidential inauguration.[5]  *See* Image 2 below and Ex. 1 (Officer D.H. Body Worn Camera (BWC) footage, at time stamp 14:01:00-14:04:20).[6]  As Chiguer and Person-2 filmed the events, Eckerman inched closer to the fighting and yelled invective at the officers—for example, that the officers were "traitors to the country."  Although he did not lay hands on any officers in this moment, Eckerman's agitating conduct poured proverbial gasoline on the fire by encouraging the rioters who were assaulting officers.

Eckerman also witnessed a rioter spray an orange chemical irritant, likely bear spray, directly at MPD Officer A.A.—an incident captured on BWC as well as by Chiguer using her cell phone.  *See* Image 3 below, as well as Exhibits 2 (Officer A.A. BWC footage at time stamp 14:01:00-14:04:20) and 3 (Chiguer video capturing spray assault).  The spray hit Officer A.A. directly in the eyes, temporarily blinding him and requiring him to retreat from the scene.  *See* Ex. 17 (report of interview of Officer A.A.).

---

[5] Evidence presented at co-defendant Niemela's trial showed that Niemela and Leach separated from the group before this moment.  Around this time, Niemela climbed a tree and took a selfie photograph within the restricted area of Capitol grounds, and Leach suffered the effects of gas from a chemical irritant canister.

[6] All audio/video exhibits cited in this memorandum will be provided to the Court via a file sharing platform.  BWC time stamps refer to the time stamp in the upper right-hand corner of the video.



***Image 2**: Eckerman (tactical vest, neon gloves, circled in red), witnessing a rioter struggling with MPD Officer D.H. for his baton and about to kick him*



***Image 3**: Eckerman (tactical vest, pointing to flag patch on his tactical vest), next to rioter about to spray chemical irritant canister (circled in red) at MPD Officer A.A.*

Despite witnessing this violent scene, Eckerman did not attempt to leave, prompting Person-2 to pull him away from the fray.   Person-2 notified him that she was leaving because she was scared.   She then departed.   *See* Image 4 below and Ex. 1 (Officer D.H. BWC).   She later wrote Eckerman in a group chat, "[t]hats when I quit filming and tried to pull you back! I was scared you were gonna get hurt!   And you got face sprayed right after that!"   *See* Ex. 4 (text message group chat between Eckerman, Niemela, Chiguer, and others).



*Image 4*: *Eckerman and Person-2 as she attempts to pull him*
*away from the clash between officers and rioters, from Officer D.H.'s BWC*

When Chiguer sent a video she recorded of this moment to a group chat including Eckerman on January 7, 2021, Eckerman responded, "that was a moment I didn't want to hurt cops but those guys had dead eyes…those guys would kill everyone."   SOO ¶ 26; Ex. 4.

While on the West Plaza, Eckerman witnessed rioters moving metal bike rack barricades on multiple occasions, sometimes using them as ladders to scale the Capitol walls.   *See, e.g.*, Ex. 5.   He saw rioters ripping away the white sheeting designed to block access to the areas under the scaffolding that had been erected for the construction of the Inauguration stage.   Ex. 6.   He saw police officers, in an attempt to control and disperse the crowd, deploy canisters of chemical irritants, later telling a friend, "they threw bombs bro it was crazy that tear gas terrible." Eckerman felt the effects of those chemical irritants, commenting to others later via text message, "that gas hurt, I won't lie."   *See* SOO ¶ 11.   Nevertheless, Eckerman was not deterred.

Eckerman and Chiguer reunited with Niemela near the foot of the scaffolding. They took advantage of the mob's breaches of barricades and police lines to advance on the Capitol building itself.   Eckerman, Chiguer, and Niemela—hereinafter, "the trio"—walked under the scaffolding and ascended a set of exterior stairs leading from the West Plaza to the Upper West Terrace.   *See* Image 5 below.



***Image 5****: Eckerman (blue box), Niemela (green box), and Chiguer (orange arrow) climbing the northwest stairs to the Upper West Terrace, as captured in video recorded by another rioter*

### Eckerman's Entry into the Capitol Building

At approximately 2:24 p.m., as captured on CCTV surveillance video, the trio walked past broken windows that other rioters were climbing through and entered the Capitol building through the Senate Wing Doors, which also featured a broken glass window.[7]   The trio ignored the blaring security alarms.

---

[7] Rioters first breached the Capitol building only eleven minutes earlier, at approximately 2:13 p.m., in this same spot.   Rioters smashed the windows on either side of the Senate Wing Doors, climbed through, and proceeded to open the doors to allow more rioters to stream in.



***Image 6:*** *CCTV footage capturing Eckerman (in red hat, within red circle) about to enter Capitol building through Senate Wing Doors, passing broken window as a rioter climbs through*

### Interior Breach #1: Eckerman, Chiguer, and Niemela Participate in Breach in the Crypt

After entering the Capitol building, the trio turned right and, after a short walk, entered the Crypt. There they found a large crowd of rioters (temporarily) stymied by a group of approximately ten USCP officers who had formed a line across the center of the Crypt, using their bodies to block the mob of rioters from further accessing the Capitol. *See* Image 7. For a brief time, the situation was a stalemate, though the officers were massively outnumbered.



***Image 7****: CCTV footage capturing the outnumbered line of police
officers blocking the mob from moving through the Crypt*

After a few minutes, however, the mob of rioters—within which the trio was standing towards the back—surged forward, overwhelming the officers with the force of their collective bodies and breaching the police line.   Dozens, if not hundreds, of rioters were ahead of the trio in this space; yet Eckerman still made his way through the crowd to within three feet of USCP Lt. Detorie and her trapped colleagues.[8]   *See* Image 8 and Ex. 7 (GoPro footage of Crypt breach). As he passed and looked at Lt. Detorie, who was clearly distressed, Eckerman chanted "stop the steal."   *See* Ex. 8 (CCTV footage of Crypt breach).

---

[8] As the Court surely recalls, Lt. Detorie testified in the trial of Eckerman's co-defendant, Kirstyn Niemela.   *See* Jan. 24, 2023, Minute Entry, *United States v. Niemela*, 21-cr-623-2 (CRC).   The transcript of that testimony is forthcoming.

10



***Image 8****: CCTV footage capturing the mob swarming officers in Crypt after breaching the police line (Eckerman in red circle with red hat, within three feet of Lt. Detorie)*

### *Interior Breach #2: Eckerman Pushes Officer K.Y., Leading to Breach, Officer K.Y.'s Vulnerability to Attack, and Rioter Dispersal Within the Capitol Building*

The mob, including the trio, thereafter encountered a bottleneck.   The Crypt exit funneled them into a small room near the Memorial Doors, a set of external doors which was at that point secure.   Rioters stood shoulder to shoulder, filling the small room, as a group of approximately four USCP officers physically blocked the threshold.   Just beyond the officers was a stairway leading to the Speaker's Suite and the House Chamber.   Unsatisfied with being at the back of the mob, Eckerman again led Niemela and Chiguer as they wormed and maneuvered their way through the crowd until they were at the front line of the stand-off between rioters and police officers.



***Image 9***: *CCTV footage capturing Eckerman (red circle), Niemela (green box), and Chiguer (blue oval) maneuvering their way to the front of the mob's stand-off with police*

The crowd around the trio screamed at the officers, with one rioter near Eckerman repeatedly warning an officer, "We're gonna go, bro. We're gonna go." *See* Ex. 9 (footage recorded by Capitol riot defendant Anthony Mariotto). As captured by Capitol CCTV footage and video filmed by another rioter, Eckerman ended up face to face with one of the officers, USCP Officer K.Y. *See id.*; *see also* Ex. 10 (CCTV footage of Memorial Door breach). Eckerman, then highly agitated, appeared to shout in his face. As the rioters started to surge forward, Officer K.Y. put his hand on Eckerman's shoulder to try to hold him and the mob back. *See* Ex. 11 (PowerPoint of still frames from Mariotto video).



***Image 10****: Screenshot from a rioter's video showing Officer K.Y.'s hand (indicated by the yellow arrow) on Eckerman's shoulder (indicated by the white arrow)*

Ignoring Officer K.Y.'s efforts to restrain him, Eckerman continued surging forward and pushed Officer K.Y.   In a written statement, Officer K.Y. reported that during this breach of the police line near the Memorial Doors, a rioter in a tactical vest—later identified as Eckerman— "pushed [his] side forcefully and knocked [him] off balance," causing him to stumble backward, trip down the two or three steps behind him, and fall to the ground.   *See* Ex. 12 (Aug. 20, 2021, email from Officer K.Y. to SA Green).   He further described his assailant as having "moved forward to the front—most aggressing [the] line."   *Id.*   Officer K.Y.'s account is corroborated by the video evidence, in which Eckerman's arm can be seen extended towards Officer K.Y., followed by the officer losing his grasp on Eckerman's shoulder and his hand falling out of the frame.   *See* Image 10 & 11, Ex. 11.   Eckerman's assault is further confirmed by his own statements shortly after leaving the Capitol building—specifically, when he bragged to his companions that he "went all the way in" and "knocked over six cops."   *See* SOO ¶ 24.



***Image 11***: *Screenshot from a rioter's video showing Officer K.Y.'s hand (red circle)*
*lose grip of Eckerman's shoulder after Eckerman pushed him*

Two things happened as a result of Eckerman's push of Officer K.Y.   First, the crowd of rioters took advantage of the hole in the police line and surged forward, overwhelming the small group of officers and ascending the now-accessible stairs leading to the Speaker's Suite and House Chamber.   Second, another rioter used a fire extinguisher to attack Officer K.Y., spraying him directly in the face while he was recovering from Eckerman's attack.   *See* Ex. 12.

### *Interior Breach #3: Eckerman Joins the Mob Surge Outside the House Chamber While Terrified Members of Congress Shelter in Place*

After Eckerman's attack on Officer K.Y., the trio ascended the newly-accessible stairs near the Memorial Doors, which led them to the second floor of the Capitol building.   The trio ultimately arrived in an area known as the Statuary Hall Connector.   There, the trio encountered a now-familiar situation: a large crowd of rioters had formed another bottleneck in front of a group of police officers using their bodies to form a police line.   This was the most sensitive, high-stakes stand-off yet: the police were blocking the rioters from reaching the elected officials gathered in

the House Chamber to certify the results of the 2020 presidential election.   The trio stood in the second or third row of the mob confronting the officers for approximately five minutes, as members of the crowd shouted at the officers and demanded they stand aside to allow the mob to fully occupy the building and confront the "traitors"—in their view, members of Congress.   *See* Image 12 and Ex. 13 ("JaydenX" video recorded by rioter John Sullivan).



**Image 12**: *Screenshot of rioter footage showing Eckerman and Chiguer in the second or third row of the mob confronting the line of police officers outside the House Chamber*

Meanwhile, inside the House Chamber, many members of Congress and their staff remained sheltered in place—some terrified, some preparing for hand-to-hand combat with rioters, all knowing that they were the targets of the mob's anger.   In an effort to protect them, USCP plain clothes officers inside the House Chamber barricaded its main door with furniture and stood guard with their guns drawn.   The situation was obviously tense and scary.



**Image 13**: *Photojournalist's image of officers guarding the inside of the House Chamber while the trio was among the mob just outside*

15

After a few minutes, the mob, including Eckerman, grew impatient and surged forward, overwhelming this third set of police officers, pushing them aside, and giving the rioters control of the hallway outside the House Chamber.   *See* Ex. 14 (rioter footage of trio at police line outside House Chamber).   Eckerman watched for several minutes as rioters chanted "Stop the Steal!" and banged on the door seen in Image 13, sometimes with flag poles.   *See id.*

### *Posing for Celebratory Souvenir Photographs Inside the Rayburn Conference Room*

The trio then walked down the hallway and entered the Rayburn Conference Room, where they posed for celebratory photographs in front of a portrait of George Washington.



**Images 14 and 15**: *Photographs of the trio inside the Rayburn Conference Room*

They then exited the Rayburn Conference Room and continued their march through the Capitol. Eckerman passed a clearly-marked exit in which the doors were already open and continued parading for another two minutes before turning back and exiting the Capitol through the East

Front House Doors.   *See* Ex. 13.

### *Eckerman's Recorded Comments Following His Exit from the Capitol*

After the trio exited the Capitol building, they stayed on the Capitol grounds and watched as others exited the building.   Despite hearing rioters shout that someone had been shot, the trio lingered outside of the Capitol building, continuing to take photographs and record videos.   In one of those videos, Eckerman bragged about his assault on police, stating, "I went all the way in, knocked over six cops…and they shot that girl."   *See* SOO ¶ 24; *see also* Ex. 15 (Chiguer video capturing Eckerman's statements).   In another cell phone video, recorded by Chiguer, Eckerman continued his rant, shouting, "they're fucking scared of us.   The real murderers are the fucking media."   SOO ¶ 24.   Similarly, a camera crew from Freedom News recorded Eckerman yelling about the shooting of Ashli Babbitt, during which he said, "I don't know her name. All I know is that we went in there as patriots – she's dead… these motherfuckers are traitors! They're traitors." *Id.* ¶ 25; Ex. 16 (Freedom News video).   Chiguer then pulled Eckerman away from the camera crew, and the trio left the area.

### *Eckerman's Statements After January 6, 2021*

The next day, Eckerman returned to Kansas and joined group text chats with Chiguer Niemela, Leach, Person-1, and Person-2.   Between January 7 and 9, 2021, Eckerman and the others in the group chat expressed their elation at their actions at the Capitol on January 6.   For example, on January 8, Eckerman texted the group: "Awesome time it was history"; "This is going down they all must pay"; and "Stay strong you are all heroes to me."   *See* Ex. 4.   The group also shared pictures, videos, and news links documenting the conflicts between "patriots" like themselves and police officers, including Eckerman's involvement in the fight between rioters and

police officers on the West Plaza before the trio entered the Capitol.   On January 9, Eckerman responded, "Man that was crazy sometimes I get myself into crazy shit you are amazing filming all of that wow."   *Id.*

The group also traded conspiracy theories suggesting that the January 6 riot was in fact a covert operation orchestrated by former President Trump and his supporters to trap and reveal traitor politicians, who would be arrested and executed imminently.   Similarly, the group advised each other to be prepared for a military coup and/or civil war to reinstate President Trump.   For example, in one message on January 9, Person-2 wrote:

> A scary terrible dark time in American history! We have to accept that people in the military will not all defect. We will be fighting American soldiers. The best we can hope for is that a significant portion come to our side…and bring weapons with them!

*Id.*   In the chat, Eckerman embraced the idea of a civil war between Trump supporters and opponents, stating, "Yeah they are moving fast let's hope the military is on our side and Trump pulls the card," and "It's crazy but what a time to be alive."   *See id.*   On January 13, 2021, Eckerman wrote the group in a separate thread, "It's fucking war."   In general, the group chat demonstrates Eckerman's pride in his actions on January 6, 2021, his self-serving belief that his attack on police was justified by their "dead eyes," and his willingness—if not eagerness—to fight other Americans in a civil war to keep the former President in power.   *See id.*

To other friends, Eckerman minimized the actions of the rioters, including himself, on January 6.   At various points, he suggested to friends that the riot at the Capitol was "staged," a

"false flag,"[9] and a "set up to make Americans look like terrorist[s]."   According to Eckerman, "they let people in to make us terrorist[s] now that was the goal," and "the Capitol was in sick bad shape after they continued with the process that night."

Like in the group chat described above, Eckerman seemed to lay blame for the riot on police officers gone rogue.   In one exchange with a friend who asked him, "[d]o blue lives still matter," Eckerman responded, "I'll talk with you offline.   Fuck the cops."   Later in the conversation, he continued, "you know nothing racist was said or done at that event, whites were killed by cops is the truth."

### *Injuries*

Eckerman's participation in the riot and forcible contributions to breaches of police lines aided those rioters who did succeed in injuring officers and destroying property.   His violent conduct also served to incite and embolden other violent rioters in his immediate surroundings. Specifically, while Eckerman was not the one who sprayed Officer K.Y. with a fire extinguisher, it was Eckerman's shove that sent Officer K.Y. stumbling to the ground, rendering him vulnerable to the fire extinguisher attack moments later.   Officer K.Y. reported that the blast from the fire extinguisher made him temporarily unable to breathe.

### III.    THE CHARGES AND PLEA AGREEMENT

On April 27, 2022, a federal grand jury returned an indictment charging Eckerman with eight counts, including a violation of 18 U.S.C. § 111(a)(1) (forcible interference with law

---

[9] Specifically, he sent a friend the following link containing a video captioned, "Proof! D.C. Capitol Building Riot Was Started by False Flag."   *See* https://cantcensortruth.com/watch ?id=5ffb6d0db051453944bbbc95.

enforcement).   On November 8, 2022, Eckerman was convicted of the § 111(a)(1) violation based on a guilty plea entered pursuant to a plea agreement.   *See* ECF 57.   The government agreed to dismiss the remaining charges.   *See id.*

## IV.   STATUTORY PENALTIES

Eckerman now faces sentencing on the violation of 18 U.S.C. § 111(a)(1).   As noted by the plea agreement and the Presentence Investigation Report ("PSR") issued by the U.S. Probation Office, he faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.   The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.   *Id.* at 49.

Here, the applicable Guidelines are not in dispute.   The United States and Eckerman both agree with the calculation determined by the U.S. Probation Office ("Probation"), as memorialized in the PSR.[10]   Probation determined that Eckerman's total adjusted offense level after acceptance

---

[10] Eckerman's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained in the PSR.   ECF No. 57 at 2-4.

Case 1:21-cr-00623-CRC   Document 105   Filed 03/01/23   Page 21 of 35

of responsibility is 17, PSR ¶ 63, and his criminal history—specifically, his lack of one—produces a criminal history category of I.   PSR ¶ 66.   Accordingly, Eckerman's Guidelines custody range is 24 to 30 months' imprisonment.   PSR ¶ 104.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the government's recommended low-end Guidelines sentence.

### A.   Nature and Circumstances of the Offense

As described in more detail in Section II.B of this memorandum, Eckerman's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a constitutional crisis.   The nature and circumstances of Eckerman's offense were of the utmost seriousness—as they involved an assault on a police officer trying to hold back a mob—and fully support the government's recommended sentence of 24 months of imprisonment.

As noted in the PSR, Eckerman participated in confrontations with police officers on Capitol grounds as well as during three separate breaches of police lines inside the Capitol.   PSR ¶¶ 25, 29-36.   During one such breach, he pushed Officer K.Y., causing him to fall down a set of stairs.   *See* Exs. 11-12.   In another, he was part of the mob surge just outside the House Chamber doors while members of Congress and their staff were stuck inside, unable to be evacuated.   In this way, Eckerman's actions had a direct impact on the obstruction of Congress and the other more serious aspects of the January 6 riot.

Eckerman's agreed-upon Sentencing Guidelines do not contain a role enhancement. It is nevertheless appropriate for the Court to consider Eckerman's role in leading his two companions into and throughout the Capitol that day. In nearly every video of the trio from inside the Capitol building, Niemela and Chiguer can be seen holding on to the back of Eckerman's tactical vest as he wormed his way through the crowd to the front of multiple police lines. He quite literally led the way.

On January 6, 2021, Eckerman encouraged, facilitated, and perpetrated mob violence. The seriousness of this offense demands a lengthy sentence of imprisonment.

### B. Eckerman's History and Characteristics

Apart from this case, Eckerman does not have a criminal history. And the government acknowledges that Eckerman had a difficult childhood, as described in the PSR. *See* PSR ¶¶ 73-75. But on January 6, 2021, Eckerman was thriving. He was and is a manager supervising 50 people at multiple facilities, earning a six-figure salary. *Id.* ¶ 94. He lives in a middle-class neighborhood. *Id.* ¶ 77. Eckerman cannot blame his unlawful actions that day on his troubled childhood.

Significantly, Eckerman's aggressive behavior in support of his political views was not limited to the riot at the Capitol on January 6. Indeed, only ten days later, on January 16, 2021, he appears to have been on the verge of arrest over a mask mandate. In a text thread with friends, his wife wrote, "me and Michael almost got arrested tonight," to which Eckerman responded, "these mask Nazi can suck a duck."[11] He then added, "[w]e did drop the hammer thou real shit and all these people say is we're gonna call the cops I said fucking call them."

---

[11] Eckerman later clarified that "duck" was a typo and he meant the male anatomy.

Eckerman repeated his intimidation tactics during his frequent protests at the U.S. District Court in Wichita, KS while armed with an AR-style semiautomatic rifle.   In one January 13, 2021, text message thread discussing whether to protest and "open carry" at the State Capitol, Eckerman shared Image 16 below, noting that Person-1 "always was with me downtown at the courthouse."

In the same thread, he also shared Image 17, in which he is likewise seen wielding an AR-style rifle, adding that he and his wife were "always ready."   Indeed, text messages recovered from Eckerman's cell phone suggest he is an expert of sorts in firearms and ammunition, as friends and co-workers frequently sought his opinion on whether to acquire a particular gun or set of ammunition.   His phone also yielded numerous photographs of AR-style semiautomatic rifles and a handgun assembled with scopes, red-dot sights, and extended magazine clips.   The search warrant conducted on Eckerman's residence in connection with this case similarly revealed two AR-style semi-automatic rifles, a shotgun, several loaded extended AR magazines, and several boxes of ammunition.



**Image 16:** *Photograph of Eckerman in front of U.S. District Courthouse in Wichita, KS*

23



***Image 17****: Eckerman holding an assault rifle and wearing a tactical vest, next to his wife*

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration.  Eckerman's criminal conduct, which includes pushing Officer K.Y. to the ground and breaching multiple police lines, was the epitome of disrespect for the law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, i.e., the need to deter crime generally, and specific deterrence—the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### i.   General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.  18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases

involving domestic terrorism, which the breach of the Capitol certainly was.[12]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

The gravity of these offenses demands deterrence.   This was not a protest.   It is important to convey to potential future rioters, especially those who would seek to influence the democratic process through violence, that their actions will have consequences.   And more importantly, it is perfectly appropriate and indeed sanctioned by § 3553(a) to impose a sentence motivated in part by general deterrence.   *See Russell*, 600 F.3d at 637 ("Subsections 3553(a)(2)(B) and (C) codify the penal goals of general and specific deterrence, requiring disincentives to match the severity of punishment to the harmfulness of the crime.")

> ii.   Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Eckerman knew a riot was occurring before he ever entered the Capitol building. He witnessed rioters punching and kicking police. He saw rioters spraying officers with chemical irritants. He felt the painful effects himself. He witnessed rioters destroying government property. None of these things deterred him. Instead, Eckerman led his two compatriots into the Capitol building through an entry marred by shattered glass and blaring security alarms.

Once inside, three separate lines of police officers using their bodies to physically block further penetration into the Capitol building did not deter him either. Instead, he repeatedly joined the physical assault of the mob on the vastly outnumbered officers and sought out the front lines

---

[12]   *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

of the conflicts between the rioters and police officers, demonstrating a desire to be the proverbial tip of the spear. During the confrontation with the second such police line Eckerman encountered, he shoved an officer to the ground and exposed him to additional violence from another rioter. After helping to breach the third police line he encountered, he watched for approximately five minutes as the rioters tried to break into the House Chamber, banging on the doors with hands and flag poles, as some members of Congress were still sheltered in place inside. He celebrated his violent conduct for days after January 6, claimed that the persons seeking to fulfill their Constitutional mandate were to blame for the violence, and advocated a civil war to vindicate his political goals.

Although Eckerman has now expressed remorse and contrition, his statements after January 6 were those of a man girding for another battle.  Eckerman's own statements after January 6 that America was at "war" and that he was "always ready"—i.e., armed with an assault rifle—demonstrate that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his history of assault and aggressive political confrontations.

Although Eckerman has now accepted responsibility by pleading guilty and expressed a modicum of contrition, any suggestion of remorse rings hollow.   Eckerman demonstrated no real recognition of wrongdoing until he pleaded guilty.   Indeed, in his private text messages to friends and family in the days and months following January 6, Eckerman refused to accept any responsibility for the violence he personally inflicted and facilitated on the officers tasked with defending the Capitol from individuals like himself.  *See United States v. Matthew Mazzocco*, 1:21-cr-54 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left

26

that Capitol. It didn't come when he went home. It came when he realized he was in trouble.").

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards."   *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.

### F.      Unwarranted Sentencing Disparities[13]

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly

---

[13] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases.   To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES."   The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, 21-cr-198 (TSC) (D.D.C.), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.").   In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.   18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."   *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."   *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent

district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[14]

Depending on the scope of the defendant's conduct on the spectrum of violent January 6 offenders, this Court and others have imposed incarceration sentences in single-count 111(a) cases varying from six months on the low end to ninety months on the high end. *Compare United States v. Leffingwell*, 21-cr-5 (ABJ) (sentenced to 6 months of incarceration, representing significant downward variance, due to defendant's early expressions of remorse, multiple traumatic brain injuries, and the effect a lengthy sentence would have on his veteran's disability benefits), *with United States v. Head*, 21-cr-291 (ABJ) (sentenced to 90 months of incarceration where defendant struck multiple officers with riot shield, dragged Officer Fanone into the mob, and had criminal history category of VI).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, this Court's sentence in *United States v. Joshua Hernandez*, 21-cr-42 (CRC), is particularly instructive. In that case, the defendant attacked officers guarding the interior of the Rotunda Doors by encouraging his fellow rioters to group-push against the officers, ultimately forcing the doors behind them open and allowing dozens more rioters to stream in.

---

[14] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.").

During this mob push, Hernandez struck an officer's helmet with a flagpole.   This Court sentenced Hernandez to 24 months' incarceration, a Guidelines sentence.[15]   *See Hernandez*, Feb. 3, 2023, Minute Entry.

Like Hernandez, Eckerman encouraged rioters who were assaulting officers on the West Plaza, encroaching on them and shouting at them that they were "traitors."   And like Hernandez, Eckerman assaulted an officer guarding a sensitive area of the Capitol near a set of external doors—in Eckerman's case, the Memorial Doors.   In doing so, Eckerman, like Hernandez, facilitated the breach of the police line, additional assaults on officers, and further dispersal of rioters throughout the Capitol.   Unlike Hernandez, however, Eckerman forcibly breached not one but *three* separate police lines in the Capitol, evincing a flagrant disregard for the law and the officers' personal safety.   On these facts, a Guidelines sentence like that imposed on Hernandez is more than appropriate.

The following 111-only cases also provide suitable comparisons to the relevant sentencing considerations in this case.   In *United States v. Willden*, 21-cr-423 (RC), for example, the defendant joined a mob attempting to breach a line of police officers guarding the Rotunda Doors. Willden succeeded in breaching this police line after discharging a chemical spray in the direction of the officers.   Notably, both Willden and Eckerman utilized the means available to them—*i.e.*, Willden with his spray; Eckerman with his body—to achieve the same goal of penetrating the Capitol further, regardless of who or what stood in their way.   Notably, unlike Eckerman, who

---

[15] In *Hernandez*, the defendant pleaded guilty to violating both 18 U.S.C. § 111(a) and § 231, which group under Sentencing Guidelines §§ 3D1.2(c) and 3D1.3(a).   In this case, Eckerman technically pleaded only to the 111(a) charge but admitted to conduct supporting a 231 charge in his Statement of Offense.   *See* SOO ¶¶ 27-28.

maneuvered his way to the front of and breached multiple police lines across two floors and the East and West sides of the Capitol, Willden only entered and remained in the Rotunda and its east lobby area.   Judge Contreras sentenced Willden to a 24 months' incarceration, a Guidelines sentence.   *Willden*, ECF Nos. 43-45.   In another case, *United States v. Mattice*, 21-cr-657 (BAH), the defendant pulled down a section of outdoor bike rack barricades separating officers on the Lower West Terrace from the mob and later sprayed officers with a chemical irritant from afar. Mattice never entered the Capitol building.   For this conduct, Chief Judge Howell sentenced him to 44 months of incarceration, a Guidelines sentence.

To be sure, Eckerman is not the most egregious 111(a) offender stemming from the riot at the Capitol on January 6, 2021.   Courts in this district have subjected 111(a) defendants to sentences higher than 24 months for conduct involving multiple assaults and/or dangerous weapons.   *See, e.g.*, *United States v. McGrew*, 21-cr-398 (BAH) (sentenced to 78 months where defendant engaged in multiple assaults and threw wooden handrail at officers); *United States v. Byerly*, 21-cr-527 (RDM) (sentenced to 34 months where defendant engaged in multiple assaults and used stun gun against officer).   The government has already accounted for Eckerman's less culpable conduct on the spectrum of 111(a) offenses by agreeing to cap its allocution at 24 months' incarceration, the low end of the applicable Guidelines.

Finally, although a case involving a violation of 18 U.S.C. § 1512(c) as opposed to § 111(a), this Court's sentence in *United States v. Christopher Moynihan* further illustrates why the government's recommendation in this case is appropriate.   *See Moynihan*, 21-cr-226 (CRC) (imposing 21-month sentence).   The defendant in *Moynihan*, in contrast with Eckerman, did not assault any officers on January 6.   As the D.C. Circuit recently instructed in a Capitol riot case,

"those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *United States v. Munchel*, No. 21-3010 (D.C. Cir. Mar. 26, 2021) (citation omitted).   By encouraging, escalating, and committing violence on January 6, Eckerman clearly falls into the former category of defendants.   This reason alone, in comparison with Moynihan's concerning—but non-violent—conduct, justifies imposing a higher sentence than that imposed in *Moynihan*.

Accordingly, the government's recommendation of a 24-month prison sentence—already reflecting the low end of the Guidelines—would not produce unwarranted sentencing disparities.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[16]   *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes

---

[16] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The police victim in this case did not suffer bodily injury as a result of Eckerman's conduct.   The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Eckerman must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Eckerman played in the riot on January 6. [17]   Plea Agreement at ¶ 13.   As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $ 2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol as of October 14, 2022.   *Id.*   Eckerman's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.   *See* PSR ¶ 124.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 24 months of incarceration; three years of supervised release; $2,000 in restitution; and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

---

[17] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.   *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

By:       */s/ Michael M. Gordon*
MICHAEL M. GORDON
Florida Bar No. 1026025
Assistant United States Attorney, Detailee
601 D St., NW
Washington, D.C. 20530
Telephone: (813) 274-6370
michael.gordon3@usdoj.gov

*/s/ Jessica Arco*
JESSICA ARCO
D.C. Bar No. 1035204
Trial Attorney, Detailee
601 D St., NW
Washington, D.C. 20530
Telephone: 202-514-3204
jessica.arco@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On March 1, 2023, a copy of the foregoing was served upon all parties listed on the
Electronic Case Filing (ECF) System.

<u>/s/ Michael M. Gordon</u>
MICHAEL M. GORDON
Florida Bar No. 1026025
Assistant United States Attorney, Detailee
United States Attorney's Office
For the District of Columbia
Telephone No. (813) 274-6370
michael.gordon3@usdoj.gov